UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| U.S. Bank National Association and<br>U.S. Bancorp, | Case No.: 12-cv-3175 (PAM/JSM) |
| Plaintiffs, | |
| v. | **MEMORANDUM AND ORDER** |
| Indian Harbor Insurance Company and<br>ACE American Insurance Company, | |
| Defendants. | |

This matter is before the Court on Indian Harbor's and ACE American's Motions for Judgment on the Pleadings. For the reasons that follow, the Court denies the Motions.

**BACKGROUND**

Beginning in 2009, three class actions were brought against U.S. Bank for overcharging overdraft fees to its customers.[1] (Compl. (Docket No. 1) ¶¶ 43-44.) Specifically, the class actions alleged that U.S. Bank re-ordered customers' debit-card transactions from highest amount to lowest amount (instead of chronologically), posted the transactions to customers' checking accounts in that order, and allowed the accounts to be overdrawn—thereby creating the most overdrafts and maximizing the overdraft fees assessed on its customers. (Id. ¶ 46.) The class actions also alleged that U.S. Bank misrepresented

---

[1] The three class actions were Speers v. U.S. Bank, N.A., No. 3:09-cv-00409-HU (D. Or. filed April 17, 2009); Waters v. U.S. Bank, N.A., No. 3:09-cv-02071-JSW (N.D. Cal. filed May 12, 2009); and Brown v. U.S. Bank, N.A., No. 2:10-cv-00356-RMP (E.D. Wash. filed Oct. 13, 2010).

its overdraft policy of high-to-low posting to its customers. (Id.) The class actions asserted a variety of common-law and statutory claims and sought the return of the excess overdraft fees collected by U.S. Bank. (Id.) Eventually, the class actions were transferred to a multi-district litigation in the Southern District of Florida.[2] (Id. ¶ 45.) And in 2013, U.S. Bank settled the class actions for $55 million. (Id. ¶¶ 51-54.)

U.S. Bank then made an insurance claim to Indian Harbor and ACE American (the "Insurers") for coverage of the amount paid to defend against and settle the class actions. (Id. ¶ 58.) U.S. Bank had purchased a professional-liability insurance policy from Indian Harbor for primary coverage with a $20 million liability limit, subject to a $25 million deductible. (Id. ¶¶ 17-18, Exs. A-B.) U.S. Bank also had purchased a similar policy from ACE American for excess coverage with a $15 million liability limit. (Id. ¶¶ 39-40, Exs. C-D.) Within those policy terms, U.S. Bank demanded coverage for more than the $25 million deductible but less than the total $35 million liability limit, or $30 million plus defense costs. (Id. ¶¶ 62, 66.)

The Insurers denied U.S. Bank's claim, primarily on the ground that the settlement was not a covered loss under the insurance policies. (Id. ¶¶ 59, 63.) The policies granted coverage only for a "Loss", and they defined "Loss" as "the total amount which [U.S. Bank] becomes legally obligated to pay on account of each Claim . . . made against [U.S. Bank] for Wrongful Acts . . . including, but not limited to, damages, judgments, settlements, costs,

---

[2] See In re Checking Account Overdraft Litig., No. 1:09-md-02036-JLK (S.D. Fla.).

2

pre-judgment and post-judgment interest and Defense Costs." (Id. ¶¶ 19-21.) The policies limited the "Loss" definition to omit, as relevant here, either "[m]atters which are uninsurable under the law pursuant to which this Policy is construed" (the "Uninsurable Provision") or "principal, interest, or other monies either paid, accrued, or due as the result of any loan, lease or extension of credit by [U.S. Bank]" (the "Extension-of-Credit Provision"). (Id. ¶ 22.) And the policies excluded from coverage claims "brought about or contributed in fact by any . . . profit or remuneration gained by [U.S. Bank] or to which [U.S. Bank] is not legally entitled . . . as determined by a final adjudication in the underlying action" (the "Ill-Gotten Gains Provision"). (Id. ¶ 27.) The Insurers maintained that the Uninsurable Provision encompassed the settlement as legally uninsurable restitution. (Id. ¶¶ 59, 63.)

U.S. Bank disagreed and, in December 2012, sued the Insurers for breach of contract and a declaratory judgment. (Id. ¶¶ 67-83.) U.S. Bank claimed that the settlement falls within the policies' definition of "Loss" and is thus covered, that the Insurers must pay the covered amount, that their refusal to do so is a breach of the policies, and that they are responsible for the resulting damages. (Id.) The Insurers now move for judgment on the pleadings.

**DISCUSSION**

Judgment on the pleadings should be granted if the moving party clearly establishes that there are no material issues of fact and that it is entitled to judgment as a matter of law. Poehl v. Countrywide Home Loans, Inc., 528 F.3d 1093, 1096 (8th Cir. 2008). When evaluating a motion for judgment on the pleadings, the Court must accept as true all facts

3

pleaded by the non-moving party and grant all reasonable inferences from the pleadings in that party's favor. Faibisch v. Univ. of Minn., 304 F.3d 797, 803 (8th Cir. 2002). While the Court generally must ignore materials outside the pleadings, it may consider "some public records, materials that do not contradict the complaint, or materials that are necessarily embraced by the pleadings." Saterdalen v. Spencer, 725 F.3d 838, 840-41 (8th Cir. 2013).

The material facts, as pertinent to these motions, are undisputed. The issue that remains is whether, as a matter of law, the settlement is a covered loss under the insurance policies. Whether the policies cover the settlement turns on the terms of the policies themselves.

When interpreting an insurance policy, the Court—a federal court sitting in diversity—applies state substantive law. E-Shops Corp. v. U.S. Bank Nat'l Ass'n, 678 F.3d 659, 663 (8th Cir. 2012). The policies are governed by Delaware law. (Compl. ¶ 23.) Under Delaware law, interpretation of an insurance policy is a question of law. Rhone-Poulenc Basic Chemicals Co. v. Am. Motorist Ins. Co., 616 A.2d 1192, 1195 (Del. 1992). Delaware courts interpret an insurance policy, like all contracts, "in a common sense manner, giving effect to all provisions so that a reasonable policyholder can understand the scope and limitation of coverage." Penn Mut. Life Ins. Co. v. Oglesby, 695 A.2d 1146, 1149 (Del. 1997). If the policy language is clear and unambiguous, its plain meaning must be enforced. ConAgra Foods, Inc. v. Lexington Ins. Co., 21 A.3d 62, 69 (Del. 2011). But if the policy language is ambiguous—in that it is susceptible to two or more reasonable interpretations—the principle of *contra proferentem* dictates that the policy is to be construed

against the insurer who drafted it. Id.

In asserting that the policies do not cover the settlement, the Insurers rely on two provisions: the Uninsurable Provision and the Extension-of-Credit Provision.

**I.      Uninsurable Provision**

The Insurers principally argue that the policies do not cover the settlement under the Uninsurable Provision. According to the Insurers, the settlement is restitutionary, and restitution is uninsurable as a matter of law. The Insurers highlight several court decisions that have rejected insurance coverage for restitution on the basis that returning money or property to which one is not legally entitled can never constitute a loss. Two aspects of the policies' clear language, however, contradict the Insurers' argument.

First, the settlement is not uninsurable under Delaware law because no Delaware authority has held that restitution is uninsurable as a matter of law. The Uninsurable Provision only carves out from the definition of "Loss" those "[m]atters which are uninsurable under the law pursuant to which this Policy is construed," or Delaware law. The Insurers have failed to cite, and the Court cannot locate, any Delaware authority deeming restitution uninsurable. Delaware courts have scrutinized public-policy bars against insurance coverage in similar contexts, only to conclude that public policy did not prohibit coverage. See, e.g., Whalen v. On-Deck, Inc., 514 A.2d 1072, 1073-74 (Del. 1986) (concluding that public policy did not bar insurance coverage for punitive damages); Wilson v. Chem-Solv, Inc., No. 85C-MY-1, 1988 WL 109375, at *1 (Del. Super. Ct. Oct. 14, 1988) (concluding that public policy did not bar insurance coverage for civil penalties assessed for

pollution). Yet neither Delaware statute nor case law expressly precludes insurance coverage for settlements constituting restitution.

Both parties speculate as to how a Delaware court, if confronted with the issue directly, would rule on the insurability of restitution. U.S. Bank suggests that Delaware courts do not readily void insurance coverage based on public-policy considerations due to their "pro-contractarian," "pro-banking," and "pro-policyholder" tilt. And the Insurers insist that Delaware courts would simply follow the law of other States that forbid coverage. The Court finds none of these reasons compelling enough to support holding, as a matter of first impression, that Delaware law prevents parties from contracting to insure settlements constituting restitution.

Second, the policies exclude from coverage restitution resulting from a final adjudication and by implication include within coverage restitution stemming from a settlement. The Ill-Gotten Gains Provision excludes from coverage money to which U.S. Bank "is not legally entitled" only "as determined by a final adjudication in the underlying action." This provision shows not merely that the parties contemplated the possibility of coverage for restitution, but that they agreed coverage would exist unless the restitution was imposed by a final adjudication. When an underlying action alleging ill-gotten gains settles before trial, there is no final adjudication in that action. See Clarendon Am. Ins. Co., No. 04C-11-167, 2008 WL 2583007, at *7 (Del. Super. Ct. June 25, 2008). So here, where the class actions alleging ill-gotten gains were settled before trial, there is no final adjudication and the settlement is not excluded from coverage.

6

The Insurers vehemently dispute this interpretation of the Ill-Gotten Gains Provision. The Insurers agree that the provision would not exclude coverage because there has been no final adjudication. But the Insurers contend that all that means is that the exclusion is irrelevant, not that it implicitly establishes coverage. Put differently, the Insurers assert that U.S. Bank is equating a coverage exclusion with a coverage grant, and that the former cannot create the latter.

To be sure, coverage logically must be granted according to the definition of "Loss" before an exclusion can negate that coverage. Yet the definition of "Loss" must be interpreted consistently with all provisions of the policy—even the exclusions. See O'Brien v. Progressive N. Ins. Co., 785 A.2d 281, 287 (Del. 2001) (stating that the provisions of insurance policies must be read "as a whole" and may not be rendered "meaningless"); Westfield Ins. Co. v. Robinson Outdoors, Inc., 700 F.3d 1172, 1175 (8th Cir. 2012) (explaining that exclusions equally affect the scope of coverage). The Insurers' proposed interpretation fails to do just that. Because the parties expressly excluded any restitution resulting from a final adjudication through the Ill-Gotten Gains Provision, they must have intended to include any restitution not resulting from a final adjudication (say, a settlement) within the definition of "Loss". And to interpret the Uninsurable Provision to always preclude coverage for restitution would nullify the Ill-Gotten Gains Provision, which plainly says that only a final adjudication precludes coverage for restitution. The provision must have effect.

The Insurers further contend that a line of cases starting with the Seventh Circuit's decision in Level 3 Communications, Inc. v. Federal Insurance Co., 272 F.3d 908 (7th Cir. 2001), support the proposition that, despite clear policy language to the contrary, restitution is uninsurable. In Level 3, the insured claimed coverage for the settlement of a securities-fraud action. Id. at 909. The insurance company responded that the settlement was restitutionary and not a covered loss. Id. at 909-10. The Seventh Circuit agreed, concluding that a "loss" within the meaning of an insurance contract cannot include the restoration of an ill-gotten gain. Id. at 910. In reaching that conclusion, the Seventh Circuit reasoned that insurance is "designed to cover only losses that injure the insured," and "[a]n insured incurs no loss within the meaning of the insurance contract by being compelled to return property that it had stolen." Id. at 910-11. The Seventh Circuit also rejected the notion that a judgment was required to determine that the settlement was not a covered loss, stating that regardless of whether the payment resulted from a settlement or a judgment, the insured had to disgorge profits that allegedly were improperly obtained. Id. at 911-12.

The Court acknowledges the rule of Level 3 and its progeny that restitution is generally uninsurable. An insured incurs no loss when it unlawfully takes money or property and is forced to return it. Asking the insurance company to pick up the tab would only bestow an unjustified windfall on the insured. But virtually all cases the Insurers cite that follow Level 3 are distinguishable because they involved policies without a specific provision requiring a "final adjudication." The parties here agreed that the Level 3 rule would only control if a final adjudication—not a settlement—resolved that U.S. Bank was

8

not legally entitled to the overdraft fees and must return them. The parties knew about the Level 3 decision when they executed the policies and still decided to cover a settlement constituting restitution absent a final adjudication. Without governing Delaware law or controlling policy language requiring otherwise, the parties' agreement must be enforced. See ConAgra Foods, 21 A.3d at 69 (stating that the plain meaning of clear policy language must be enforced).

In sum, the Insurers' reliance on the Uninsurable Provision to assert that the settlement is not a covered loss under the policies is misplaced. Delaware law does not prohibit insurance for restitution and the parties agreed that restitution is insurable when, as here, the underlying allegations of ill-gotten gains were not finally adjudicated.

**II.     Extension-of-Credit Provision**

The Insurers also argue that the policies do not cover the settlement under the Extension-of-Credit Provision. The Insurers contend that the settlement stems from U.S. Bank's overdraft policy of high-to-low posting, and that overdraft protection constitutes an extension of credit to its customers. So, say the Insurers, the settlement was paid as a result of an extension of credit, which is not a covered loss under the policies.

The Insurers are right that the Extension-of-Credit Provision omits from the policies' definition of "Loss" money paid "as a result of any loan, lease or extension of credit" by U.S. Bank. The Insurers also are right that at least one court has held that a bank's practice of covering customer overdrafts constitutes a loan to its customers for insurance purposes. See Affilliated Bank/Morton Grove v. Hartford Accident & Indem. Co., No. 91-4446, 1992 WL

91761, at *4 (N.D. Ill. Apr. 22, 1992). But in interpreting and applying the Extension-of-Credit Provision to preclude coverage of the settlement, the Insurers are wrong in two ways.

First, the Insurers' interpretation of the Extension-of-Credit Provision is overbroad and untenable. See Penn Mut. Life Ins., 695 A.2d at 1149 (stating that insurance policies must be interpreted "in a common sense manner"). It is overbroad because the provision fundamentally is designed to prevent U.S. Bank from obtaining insurance coverage for losses due to unpaid loans, which are not at issue here. And it is untenable because, taken to its extent, the provision would bar coverage of any professional-liability claim relating to U.S. Bank's lending operations. The parties could not have intended to exclude from coverage such a large swath of potential claims.

Second, the Insurers' application of the Extension-of-Credit Provision erroneously assumes that the settlement was based on an extension of credit. The class actions alleged that the overdraft fees were charged against transactions while there still were positive balances in customers' accounts—before any overdraft protection was extended. Thus, the assessment of those fees, and their repayment as required by the settlement, were based on the use of high-to-low posting and not on an extension of credit.

For those two reasons, the Insurers' reliance on the Extension-of-Credit Provision to assert that the settlement is not a covered loss under the policies is likewise misplaced.

**CONCLUSION**

At this stage of the proceedings, the Insurers have not clearly established as a matter of law that either the Uninsurable Provision or the Extension-of-Credit Provision prevents the settlement from being a covered loss under the insurance policies. Accordingly, **IT IS HEREBY ORDERED** that:

1. Indian Harbor's Motion for Judgment on the Pleadings (Docket No. 46) is **DENIED**; and

2. ACE American's Motion for Judgment on the Pleadings (Docket No. 48) is **DENIED**.

Dated: July 3, 2014

                *s/ Paul A. Magnuson*
                Paul A. Magnuson
                United States District Court Judge