UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| U.S. Bank National Association and U.S. Bancorp, | Case No. 12-cv-3175 (PAM/JSM) |
| Plaintiffs, | |
| v. | **MEMORANDUM AND ORDER** |
| Indian Harbor Insurance Company and ACE American Insurance Company, | |
| Defendants. | |

_____

This matter is before the Court on U.S. Bank's Motion for Summary Judgment. For the reasons that follow, the Court grants the Motion.

**BACKGROUND**

This is a fiercely contested insurance case. U.S. Bank National Association and U.S. Bancorp (collectively "U.S. Bank") are suing Indian Harbor Insurance Company and ACE American Insurance Company (collectively the "Insurers") for coverage of both $30 million out of a $55 million settlement payment and related defense costs in an overdraft-fee dispute. Though the issues are complicated, the facts are straightforward.

**A.     Overdraft Fees**

U.S. Bank, like many banks, offers overdraft protection to its customers with checking accounts. When customers attempt transactions for more money than is in their accounts, they overdraw the accounts. As a service, U.S. Bank pays the transactions. To compensate for that service, U.S. Bank charges a fee for each overdraft. Customers are

assessed overdraft fees for transactions that initially overdraw their accounts and for additional transactions until they deposit funds to cover the overdrafts.

Because U.S. Bank charges customers overdraft fees for transactions that either cause their accounts to be overdrawn or happen while their accounts are overdrawn, the point at which the accounts become overdrawn—and thus the order in which the transactions post to the accounts—matters. If smaller transactions post before larger transactions, the accounts will deplete and become overdrawn at a slower rate, fewer transactions will remain to post after the accounts became overdrawn, and fewer overdraft fees will be assessed for the remaining transactions. But if larger transactions post before smaller transactions, the opposite will occur.

To illustrate, take this example. A customer has $200 in her checking account. Her bank charges a $25 fee each time she overdraws the account. One day, she makes five purchases with her debit card in this order: $4 café Americano, $20 dozen doughnuts for the office, $30 birthday gift for her daughter, $300 airplane ticket to Florida, and $50 theater tickets. If the transactions post to her account from smallest to largest, only the airplane ticket will overdraw the account and incur one overdraft fee of $25. If the transactions post chronologically, both the airplane ticket and the theater tickets will overdraw the account and incur two overdraft fees of $50. And if the transactions post from largest to smallest, all the transactions will overdraw the account and incur five overdraft fees of $125.

B.      **Underlying Class Actions**

Beginning in 2009, three class actions were brought against U.S. Bank for overcharging overdraft fees to its customers.[1] (Gilinsky Aff. (Docket No. 128) Exs. 1-3.) In particular, the class actions alleged that U.S. Bank unlawfully engaged in high-to-low posting—in that it posted customers' debit-card transactions to their checking accounts from largest to smallest—to create the most overdrafts and maximize the assessed overdraft fees. (Id.) The class actions also alleged that U.S. Bank inadequately disclosed to its customers that it posted their transactions from high to low. (Id.) The class actions asserted claims for breach of contract, unconscionability, conversion, and unjust enrichment; and sought remedies of declaratory relief, return of the excess overdraft fees, and damages. (Id.) Eventually, the class actions were transferred to a multi-district litigation in the Southern District of Florida.[2] (Savage Aff. (Docket No. 127) ¶ 2.)

At the time, U.S. Bank maintained professional-liability insurance with the Insurers. (Gilinsky Aff. Exs. 4-5.) It had purchased a primary policy from Indian Harbor with a $20 million liability limit, subject to a $25 million deductible. (Gilinsky Aff. Ex. 4.) It had also purchased an excess policy from ACE American with a $15 million liability limit. (Gilinsky Aff. Ex. 5.) The policies grant coverage for "Loss which [U.S. Bank] shall become legally obligated to pay as result of any Claim first made against [it]

---

[1] The class actions were Speers v. U.S. Bank, N.A., No. 3:09-cv-409 (HU) (D. Or. filed April 17, 2009); Waters v. U.S. Bancorp, No. 3:09-cv-2071 (JSW) (N.D. Cal. filed May 12, 2009); and Brown v. U.S. Bank, N.A., No. 2:10-cv-356 (RMP) (E.D. Wash. filed Oct. 13, 2010).

[2] See In re Checking Account Overdraft Litig., No. 1:09-md-2036 (JLK) (S.D. Fla.).

during the Policy Period arising out of any Wrongful Act committed by [it] during or prior to the Policy Period while performing Professional Services." (Gilinsky Aff. Ex. 4, at 15.) The policies further require that U.S. Bank obtain the Insurers' consent before settling a claim. (Id. at 17.)

In 2012, U.S. Bank entered into private mediation to resolve the class actions and discovered an opportunity to reach a settlement. (Savage Aff. ¶ 9.) Complying with the policies, it asked the Insurers for consent. (Id. ¶ 10.) Indian Harbor consented to a settlement of $45 million and ACE American consented to a settlement of $60 million, yet both Insurers reserved their rights to later challenge coverage. (Gilinsky Aff. Exs. 26-27.) Having received the Insurers' consent, U.S. Bank settled the class actions in 2013 for $55 million. (Gilinsky Aff. Exs. 25, 28.) Under the settlement, U.S. Bank agreed to pay the $55 million into a fund to be allocated among the class members. (Id.) But U.S. Bank did not admit liability on the claims. (Id.) Nor did the settlement characterize the payment as restitution. (Id.)

**C.     Current Coverage Lawsuit**

U.S. Bank next sought insurance coverage from the Insurers for the amount paid to defend against and settle the class actions. (See Savage Aff. ¶ 12.) Within the policy terms, it demanded coverage for more than the $25 million deductible but less than the total $35 million liability limit, or $30 million plus defense costs. (Id.)

The Insurers denied coverage, principally on the ground that the settlement was not a "Loss" under the policies. (Id.; Gilinsky Aff. Ex. 31.) The policies define "Loss" as "the total amount which [U.S. Bank] becomes legally obligated to pay on account of

each Claim . . . in each Policy Period . . . made against [it] for Wrongful Acts . . . including, but not limited to, damages, judgments, settlements, costs, pre-judgment and post-judgment interest and Defense Costs." (Gilinsky Aff. Ex. 4, at 21.) The policies except from the loss definition, as relevant here, either "[m]atters which are uninsurable under the law pursuant to which this Policy is construed" (the "Uninsurable Provision") or "principal, interest, or other monies either paid, accrued, or due as the result of any loan, lease or extension of credit by [U.S. Bank]" (the "Extension-of-Credit Provision"). (Id. at 22.) And although it may be a loss, the policies exclude from coverage "any payment for Loss in connection with any Claim made against [U.S. Bank] . . . brought about or contributed in fact by any . . . profit or remuneration gained by [U.S. Bank] to which [it] is not legally entitled . . . as determined by a final adjudication in the underlying action" (the "Ill-Gotten Gains Provision"). (Id. at 15.) In the Insurers' view, the Uninsurable Provision barred coverage because the settlement constitutes restitution and restitution is uninsurable as a matter of public policy. (Gilinsky Aff. Ex. 31.)

U.S. Bank disagreed and sued the Insurers for breach of contract and a declaratory judgment. (Compl. (Docket No. 1).) It alleged that the settlement falls within the policies' loss definition and is covered, the Insurers must pay the covered amount, their refusal to do so is a breach of the policies, and they are responsible for the resulting damages. (Id. ¶¶ 67-83.) The Insurers denied the allegations. (Ans. (Docket Nos. 24 & 33).)

The Insurers then moved for judgment on the pleadings, arguing that the settlement was not a covered loss under the policies based on the Uninsurable Provision

and the Extension-of-Credit Provision. (<u>See</u> Mem. & Order (Docket No. 105) 1-3.) Applying the policies' plain language, the Court denied judgment on the pleadings on both bases. (<u>Id.</u> at 3-11.)

Discontent with that decision, the Insurers proceeded to secure its immediate reversal. They first sought reconsideration of the decision, which the Court denied. (Order (Docket No. 108).) They also sought certification of the decision for interlocutory appeal under 28 U.S.C. § 1292(b), and for legal resolution to the Delaware Supreme Court, both of which the Court denied. (Mem. & Order (Docket No. 139).)

U.S. Bank now moves for summary judgment. Because the parties have conducted relatively no meaningful discovery since the Court denied judgment on the pleadings (other than the production of documents about the underlying class actions and general claims-handling processes), the current record is effectively the same as it was then.

**DISCUSSION**

Summary judgment should be granted if the moving party shows that there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if its resolution affects the outcome of the case. <u>Paine v. Jefferson Nat'l Life Ins. Co.</u>, 594 F.3d 989, 992 (8th Cir. 2010). A dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. <u>Id.</u> When evaluating a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. <u>Marlowe v. Fabian</u>, 676 F.3d 743, 746 (8th Cir. 2012).

The overarching issue here is whether the policies cover the settlement. The parties do not dispute that the settlement relates to a claim made against U.S. Bank during the policy period for a wrongful act allegedly committed by it while performing professional services. Instead, they dispute that the settlement is a loss. Whether the settlement is a loss turns on the interpretation of the policies' definition of loss.

When interpreting an insurance policy, the Court—a federal court sitting in diversity—applies state substantive law. E-Shops Corp. v. U.S. Bank Nat'l Ass'n, 678 F.3d 659, 663 (8th Cir. 2012). The policies are governed by Delaware law. (Gilinsky Aff. Ex. 4, at 25.) Under Delaware law, the interpretation of an insurance policy is a question of law. Rhone-Poulenc Basic Chemicals Co. v. Am. Motorist Ins. Co., 616 A.2d 1192, 1195 (Del. 1992). Delaware courts interpret an insurance policy, like all contracts, "in a common sense manner, giving effect to all provisions so that a reasonable policyholder can understand the scope and limitation of coverage." Penn Mut. Life Ins. Co. v. Oglesby, 695 A.2d 1146, 1149 (Del. 1997). If the policy language is clear and unambiguous, its plain meaning must be enforced. ConAgra Foods, Inc. v. Lexington Ins. Co., 21 A.3d 62, 69 (Del. 2011). But if the policy language is ambiguous—in that it is susceptible to two or more reasonable interpretations—it is to be construed against the insurer who drafted it and for the insured. Id.

The parties do not dispute that the settlement satisfies the policies' general loss definition, as outlined above. Rather, they dispute that the settlement falls within one of these two exceptions to that definition: the Uninsurable Provision and the Extension-of-Credit Provision.

Pertinent to those exceptions, the material facts are undisputed. The Insurers contend that factual disputes exist and further discovery is needed mainly on three issues: the underwriting intent of the policies, the nature and propriety of high-to-low posting and the settlement, and the account balances of customers who were assessed overdraft fees. (See Sandnes Aff. (Docket No. 136).) But as explained below, those issues do not raise genuine disputes of material fact because the policy language is unambiguous and extrinsic evidence of intent is inconsequential, the legality of high-to-low posting is not for the Court to determine and the settlement speaks for itself, and customers' account balances are not dispositive.

To resolve whether the policies cover the settlement, the Court is therefore left to decide, as a matter of law, whether the settlement falls within either the Uninsurable Provision or the Extension-of-Credit Provision and thus is not a loss.

**A.   Uninsurable Provision**

The Insurers primarily argue that the settlement is not a loss under the Uninsurable Provision. According to the Insurers, the settlement requires U.S. Bank to return unlawfully assessed overdraft fees to its customers, returning something that one wrongfully took to its rightful owner constitutes restitution, and restitution is uninsurable under Delaware law. U.S. Bank responds that high-to-low posting complies with the law, the Ill-Gotten Gains Provision indicates that coverage exists when claims alleging ill-gotten gains and seeking disgorgement of those gains are settled before a final adjudication in the underlying action, and no Delaware authority forbids insurance coverage for restitution.

### 1. Is Restitution Insurable Under Delaware Law?

If the Insurers are correct that the settlement constitutes restitution, the Court would need to examine whether restitution is insurable under Delaware law. Unfortunately, the Insurers have failed to cite, and the Court cannot locate, any Delaware statute or case law reaching that issue. The parties have previously speculated on how a Delaware court would rule. U.S. Bank suggested that Delaware courts do not readily void insurance coverage based on public-policy considerations due to their "pro-contractarian," "pro-banking," and "pro-policyholder" tilt. And the Insurers insisted that Delaware courts would simply follow the lead of other States that prohibit coverage.

But the Court need not decide the insurability of restitution under Delaware law because, even if restitution is not insurable, the policies require the settlement to actually be—and not just allegedly be—restitution to be uninsurable. For this Motion, the Court will therefore assume without deciding that Delaware law precludes insurance coverage for restitution as a matter of public policy. That assumption makes sense because an insured does not suffer loss when it wrongfully takes money or property and is forced to return it; asking the insurer to pick up the tab would only bestow an unjustified windfall on the insured. See J.P. Morgan Sec. Inc. v. Vigilant Ins. Co., 21 N.Y.3d 324, 335-36 (2013) ("[A] 'loss' within the meaning of an insurance contract does not include the restoration of an ill-gotten gain." (citation and quotation marks omitted)).

Consistent with that assumption, the policies unambiguously do not cover restitution. The Uninsurable Provision carves out from the loss definition "[m]atters

which are uninsurable" under Delaware law.  (Gilinsky Aff. Ex. 4, at 22.)  If restitution is uninsurable under Delaware law, it is obviously not a covered loss under the policies.

### 2. If Not, Does the Settlement Constitute Restitution?

That conclusion, however, does not end the analysis.  The crux of this dispute is not whether restitution is insurable, but whether the settlement constitutes restitution.  This is because another provision in the policies, the Ill-Gotten Gains Provision, directly addresses the circumstance when an insured pursues coverage for a payment that resolves claims alleging ill-gotten gains and seeking disgorgement of those gains—or put differently, restitution.  The provision excludes from coverage a payment for loss connected to a claim resulting from money to which U.S. Bank "is not legally entitled . . . as determined by a final adjudication in the underlying action." (Id. at 15.)  The insertion of that provision in the policies begs the question: Can a payment be restitutionary and uninsurable under the policies based on (1) a settlement resolving claims that allege ill-gotten gains and seek disgorgement of those gains or (2) a final adjudication in the underlying action determining that the allegations of ill-gotten gains have merit and ordering the disgorgement of those gains?  The policies choose the second answer.

The policies unambiguously require that a final adjudication in the underlying action determine that a payment is restitution before the payment is barred from coverage as restitution.  The Court must interpret the loss definition and its exceptions consistently with all policy provisions—even the exclusions.  See O'Brien v. Progressive N. Ins. Co., 785 A.2d 281, 287 (Del. 2001) (directing that provisions of insurance policies be read "as a whole" and not be rendered "meaningless"); Westfield Ins. Co. v. Robinson Outdoors,

Inc., 700 F.3d 1172, 1175 (8th Cir. 2012) (explaining that exclusions equally affect the scope of coverage).  The Uninsurable Provision omits from coverage restitution, and the Ill-Gotten Gains Provision omits from coverage a payment that a final adjudication in the underlying action determined is restitution.  If the Court interpreted the Uninsurable Provision to preclude coverage for a payment based on a settlement resolving claims for restitution, it would nullify the Ill-Gotten Gains Provision that precludes coverage for a payment based only on a final adjudication determining that the claims warrant restitution.  So to interpret the two provisions consistently, the Court must read the Uninsurable Provision to bar coverage for a payment that a final adjudication in the underlying action determined is restitution.

Under that interpretation, the settlement is not a payment that a final adjudication in the underlying action determined is restitution.  When an underlying action alleging ill-gotten gains and seeking disgorgement of those gains settles before trial, there is no final adjudication in that action determining that the gains were ill-gotten and ordering the return of those gains.  See AT & T v. Clarendon Am. Ins. Co., No. 04C-11-167 (JRJ), 2008 WL 2583007, at *7 (Del. Super. Ct. June 25, 2008).  Here, where the class actions alleging that U.S. Bank unlawfully assessed overdraft fees and seeking the return of those fees settled before trial and without an admission of liability, there was no final adjudication determining that U.S. Bank committed unlawful conduct and ordering the refund of the profits derived from that conduct.  In other words, the settlement allegedly constitutes restitution but is not a final adjudication determining restitution.

The Court emphasizes that it will not automatically presume—as the Insurers do—that the settlement constitutes restitution because it resolved claims alleging ill-gotten gains and seeking disgorgement of those gains. Not only does the clear policy language, and especially the Ill-Gotten Gains Provision, prevent the Court from doing so. But the common-sense effect of a settlement does as well. If a settlement resolves claims alleging unlawful activity but excludes an admission of liability for the activity, it does not establish that the underlying allegations are true or false. See Atwell v. RHIS, Inc., 974 A.2d 148, 155 (Del. 2009) ("We cannot allow litigants to imply that one party's decision to settle means that the settling party has admitted liability."). Instead, a settlement represents the parties' willingness to resolve the claims after weighing the negotiated settlement amount against the potential judgment amount and accounting for the costs and benefits of continued litigation. That is exactly what this settlement was.[3]

### 3. Are Any of the Insurers' Counterarguments Availing?

The Insurers quarrel with the Court's interpretation and application of the Uninsurable Provision on five noteworthy grounds.

First, the Insurers contend that the Ill-Gotten Gains Provision cannot affect the Uninsurable Provision because the Uninsurable Provision grants coverage and the Ill-Gotten Gains Provision excludes coverage. It is, say the Insurers, a maxim of insurance law that an exclusion cannot generate a grant. What the Insurers fail to recognize,

---

[3] The Court also emphasizes that it is not its role to decide whether U.S. Bank unlawfully assessed overdraft fees. As the Court reads the Ill-Gotten Gains Provision, the court in the underlying action must finally adjudicate whether the allegations of ill-gotten gains have merit, not the court in the coverage action. The Court can decide whether there was a final adjudication in the underlying action, and has determined here that there was not.

however, is that the existence of a coverage exclusion may alter the scope of a coverage grant. Parties have no reason to exclude a particular matter from coverage in an insurance policy if they did not intend that the policy initially granted coverage for that matter. Concluding to the contrary would strip the coverage exclusion of any purpose, and it must have effect. So too here. By excluding from coverage a payment that a final adjudication in the underlying action determined to be restitution, the parties implicitly granted coverage for a payment that is merely alleged to be restitution.

Second, the Insurers contend that the Ill-Gotten Gains Provision also cannot affect the Uninsurable Provision because exceptions (like the Uninsurable Provision) narrowly focus on the loss recoverable under the policies, where exclusions (like the Ill-Gotten Gains Provision) relate more broadly to claims covered by the policies. As the dispute here hinges on the whether the settlement is a loss and not a claim, the Insurers implore the Court to disregard the Ill-Gotten Gains Provision. The Court agrees that there is a distinction between a claim and a loss—the policy defines them separately and observes that a claim could include both covered and uncovered loss. The Court further agrees that the Uninsurable Provision is an exception to a loss and the Ill-Gotten Gains Provision is an exclusion to a claim.

But the Court gives no credence to the Insurers' notion that a loss exception and a claim exclusion have no bearing on each other. For one, the Insurers have presented no legal authority to support otherwise. And two, the concepts of claim and loss are connected in the context of this case. If a claim depends on the underlying allegations and a loss depends on the requested remedy, whether a loss exists first depends on

whether a claim exists because no remedy is warranted if the allegations lack merit. Or if the allegations are for ill-gotten gains and the remedy is for disgorgement of those gains, but a final adjudication must determine whether the allegations have merit to trigger a claim exclusion, the final adjudication also impacts whether the remedy is warranted and could trigger a loss exception. Hence, a claim exclusion can affect a loss exception.

Third, the Insurers protest that the interpretation leads to an absurd result where settlements resolving claims for restitution are loss but judgments ordering restitution are not loss. The Insurers highlight a myriad of cases for the proposition that, in determining whether a settlement resolving claims that allege ill-gotten gains and seek disgorgement of those gains is an insurable loss, the Court must look to the nature of the underlying allegations and requested remedies and not to whether those allegations and remedies were finally adjudicated. In short, according to the Insurers, it is irrelevant whether U.S. Bank actually did anything wrong and must pay restitution so long as the settlement resolved claims alleging wrongdoing and seeking relief that is restitutionary.

But that is not what the policies require. As discussed at length above, the policies require that a final adjudication in the underlying action determine that claims for restitution actually warrant restitution. Under a policy with a final-adjudication requirement, mere allegations are insufficient. If allegations of unlawful activity are never determined to be true, a payment to dispose of those allegations is not restitution because restitution can only occur if that which is being returned was wrongfully taken. So if U.S. Bank's assessment of overdraft fees was lawful, the return of those fees cannot be restitution because U.S. Bank is legally entitled to those fees.

In that regard, all of the cases the Insurers cite are distinguishable. Several of the cases concluding that restitution is uninsurable whether by settlement or judgment did not involve policies that include a final-adjudication requirement. See, e.g., CNL Hotels & Resorts, Inc. v. Twin City Fire Ins. Co., 291 F. App'x 220, 223-24 (11th Cir. 2008); Level 3 Commc'ns, Inc. v. Fed. Ins. Co., 272 F.3d 908, 910-12 (7th Cir. 2001). The cases holding that an allegedly restitutionary settlement is uninsurable despite policy language requiring a final adjudication failed to otherwise analyze the impact of the final-adjudication requirement. See, e.g., Dobson v. Twin City Fire Ins. Co., No. 11-cv-0192 (DOC/MLG), 2012 WL 2708392, at *9-10 (C.D. Cal. July 5, 2012); Aon Corp. v. Certain Underwriters at Lloyd's of London, No. 06-16852 (Ill. Cir. Ct. Ch. Div. Dec. 3, 2010). And the two cases barring coverage for a settlement in an overdraft-fee dispute relied on specific fee exclusions in the policies that the policies here do not contain. See PNC Fin. Servs., Grp., Inc. v. Houston Cas. Co., No. 13-cv-331, 2014 WL 2862611, at *2-3 (W.D. Pa. June 24, 2014); Fidelity Bank v. Chartis Specialty Ins. Co., No. 1:12-cv-4259 (RWS), 2013 WL 4039414, at *3-4 (N.D. Ga. Aug. 7, 2013).

Fourth, the Insurers contend that the Court is erroneously allowing parties to contract around public policy and agree to cover uninsurable restitution. See CSX Transp., Inc. v. Mass. Bay Transp. Auth., 697 F. Supp. 2d 213, 229 (D. Mass. 2010) ("Even sophisticated parties cannot contract around public policy."). But the Court does not conclude that parties may contract to insure a payment, like restitution, that is uninsurable under public policy. All the Court concludes is that parties may agree to ensure that a payment truly fits within a category of matters that are legally uninsurable.

That contractual ability does not change the categories themselves and render insurable that which is uninsurable. If restitution is uninsurable by public policy, the parties may contract to require that the payment is actually—and not just allegedly—restitution. That conclusion is consistent with public policy.

Finally, the Insurers warn that the interpretation will incentivize banks to settle rather than litigate these types of lawsuits to obtain coverage for restitution. That warning echoes the sentiment expressed in other cases. See, e.g., Level 3, 272 F.3d at 911 (declaring that it "can't be right" that coverage for restitution could pivot on whether it was made by way of settlement or judgment because the insured, "seeing the handwriting on the wall," could simply agree "to pay the plaintiffs in the fraud suit all they were asking for" and then "retain the profit it had made from a fraud" through a coverage reimbursement). Yet insurance companies can counter that incentive by not consenting to the settlement. The policies require that the Insurers consent before U.S. Bank may settle a claim. If the Insurers were concerned that the settlement constituted restitution, they could have refused consent or conditioned consent on an admission of liability for wrongdoing or a stipulation that the payment was restitution. The Insurers would have been wiser to refuse or condition consent at the outset rather than consent and later contest coverage in avoidable litigation.

Bottom line, the dispute on the Uninsurable Provision is not about whether restitution is insurable; the Court assumes that it is not. The dispute is about whether the settlement constitutes restitution. The clear policy language controls on that question, and requires that for a payment to be restitution, it must be based on a final adjudication

in the underlying action determining it is restitution instead of a settlement resolving claims for restitution. Because the settlement is not a payment that a final adjudication in the underlying action determined is restitution, the Uninsurable Provision does not prevent the settlement from being a loss.

**B.     Extension-of-Credit Provision**

The Insurers alternatively argue that the settlement is not a loss under the Extension-of-Credit Provision. They say that the settlement comprises the return of overdraft fees paid or accrued as the result of overdraft protection and overdraft protection is an extension of credit. U.S. Bank responds that the provision contemplates losses due to unpaid loans and not fees for lending services, and the overdraft fees were assessed while customers still had positive account balances and before any overdraft protection was provided.

To be sure, the Extension-of-Credit Provision unambiguously removes from the loss definition "monies either paid, accrued, or due as the result of . . . an extension of credit." (Gilinsky Aff. Ex. 4, at 22.) And a few courts have held that a bank's practice of paying transactions that overdraw customers' accounts constitutes a loan to its customers for insurance purposes. See Sayan v. Riggs Nat'l Bank of Wash., D.C., 544 A.2d 267, 269 (D.C. 1988) (stating that the "payment of an overdraft by the bank carries with it an implicit agreement by the customer to repay the loan"); Affiliated Bank/Morton Grove v. Hartford Accident & Indem. Co., No. 91-cv-4446, 1992 WL 91761, at *6 (N.D. Ill. Apr. 22, 1992) (reasoning that "an overdraft by a bank depositor is treated as a loan from the

bank to the depositor just as depositors with positive balances are considered creditors of the bank").

That said, this case is not about the provision of overdraft protection, but the assessment of overdraft fees. The settlement resolved claims that ultimately alleged as injury that U.S. Bank overcharged overdraft fees through high-to-low posting and not that U.S. Bank offered overdraft protection in the first place. This is a distinction that makes a difference given that an overdraft fee is simply a fee for a service and overdraft protection is likely an extension of credit. If the settlement had compensated customers for improperly provided overdraft protection, it would have been paid as the result of a loan. But if the settlement returned the assessed overdraft fees, as the Insurers urge, it was paid as the result of a fee. The second scenario describes this case.

Because the settlement was not paid as the result of an extension of credit, the Extension-of-Credit Provision does not prevent the settlement from being a loss. As the Court decides this issue on that basis, it need not address the parties' arguments about whether the provision encompasses only loan losses and whether the overdraft fees were assessed against positive account balances.

**CONCLUSION**

The settlement falls within neither the Uninsurable Provision nor the Extension-of-Credit Provision—the Insurers' only defenses to coverage—and thus is a covered loss under the policies. The Insurers must indemnify U.S. Bank for $30 million out of the $55 million settlement payment and reimburse it for related defense costs. Accordingly,

**IT IS HEREBY ORDERED** that U.S. Bank's Motion for Summary Judgment (Docket No. 125) is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: _____        _____
                                        Paul A. Magnuson
                                        United States District Court Judge